# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL APOLINAR,<br><br>Petitioner,<br><br>v.<br><br>RAYMOND MADDEN,<br><br>Respondent. | Case No. 1:21-cv-00217-DAD-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS<br><br>ORDER DIRECTING CLERK OF COURT TO UPDATE PETITIONER'S ADDRESS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On April 22, 2016, Petitioner was convicted after a jury trial in the Fresno County Superior Court of first-degree murder. (1 CT[1] 294.) The jury could not agree on a finding regarding the special allegation that Petitioner personally and intentionally discharged a firearm which proximately caused death to the victim. (1 CT 293; 7 RT[2] 1529–34.) Petitioner was sentenced to an indeterminate imprisonment term of twenty-five years to life. (2 CT 334.) On January 7, 2020, the California Court of Appeal, Fifth Appellate District affirmed the judgment.

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on May 11, 2021. (ECF No. 14.)
[2] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on May 11, 2021. (ECF No. 14.)

1  People v. Apolinar, No. F073905, 2020 WL 65080 (Cal. Ct. App. Jan. 7, 2020). On January 23,

2  2020, the California Court of Appeal denied Petitioner's petition for rehearing. (LD[3] 12.) On

3  March 25, 2020, the California Supreme Court denied Petitioner's petition for review. (LD 13.)

4        In the instant federal petition for writ of habeas corpus, Petitioner challenges the

5  admission of his August 3, 2011 statements to law enforcement, asserting that the state courts'

6  adjudication of his claim resulted in a decision that was contrary to, or involved an unreasonable

7  application of, clearly established federal law as determined by the Supreme Court and was

8  based on an unreasonable determination of the facts in light of the evidence presented in the state

9  court. (ECF No. 1 at 5, 19.)[4] Respondent filed an answer. (ECF No. 15.)

## II.

## STATEMENT OF FACTS[5]

Appellant worked at a mattress company where James B. was plant manager. Appellant was disrespectful to supervisors and on one occasion got into a shoving match with another employee. James fired appellant. A few months later, on June 30, 2011,[6] at approximately 7:00 p.m., appellant encountered James's brother, Harvey B., and got into a verbal confrontation with him. Appellant told Harvey that James was "a punk and a bitch"; that James "acts like his shit don't stink"; and that appellant was going to "tell it to [James's] face" by going to James's house. Harvey said that appellant was "filled with anger ... as if he was just holding this grudge for a long time and just did not want to let it go."

That night, at approximately 11:45 p.m., James was shot in his home while taking a shower and died. Eight fresh shell casings were found outside James's bathroom window. There were four holes consistent with a bullet shape in the bathroom window screen, and some of them had "halos," which indicated the gun was fired from a close distance. The screen was peeled up on one side. Another spent shell casing of the same type was found under James's body. It was determined that for this to have happened, the shooter would have had to put his entire arm inside the bathroom past the threshold of the window before firing. Harvey gave police appellant's name as a possible suspect because of the conversation he had with him earlier that day.

Neighbors gave descriptions of a vehicle they saw leaving James's house after the shooting that matched appellant's truck. On July 1, Fresno County Sheriff's Detective Falls called appellant to speak with him. Appellant hung up on Falls after Falls told appellant he was investigating an injury of appellant's coworker and asked about appellant's whereabouts. On July 2, Falls and Detective Grajeda

---

[3] "LD" refers to the documents and recordings lodged by Respondent on May 11, 2021, July 11, 2022, and July 15, 2022. (ECF Nos. 14, 20–21, 23–24.)

[4] Page numbers refer to the ECF page numbers stamped at the top of the page.

[5] The Court relies on the California Court of Appeal's January 7, 2020 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[6] All further references to dates are to dates occurring in 2011.

conducted a pretext stop of appellant's vehicle. Falls asked appellant if he would agree to voluntarily go to police headquarters to provide a statement, and appellant agreed. Falls and Grajeda recorded an interview with appellant that day, and appellant denied knowing anything about James's death.

On August 3, appellant was brought to the Fresno Sheriff's Department headquarters for more questioning. Grajeda interviewed appellant with Detective Toscano and gave appellant a *Miranda* admonition. Appellant agreed to speak with Grajeda and Toscano and denied involvement with James's murder. The detectives asked appellant about an acquaintance of his named A.M.[7] and suggested that A.M. saw appellant kill James. Appellant said if A.M. said he saw appellant commit the murder, A.M. would be lying, and appellant continued to deny involvement. Appellant was then placed under arrest for James's murder and taken to a holding cell.

Before being transported to jail, appellant told the detectives he wanted to speak to them again. Appellant then explained that on the night of James's death, he obtained a gun to "not necessarily kill ... but maybe fuckin' shoot" James. Appellant said his intent was not to kill James but to shoot him in the "leg or the arm or something." Appellant then called A.M. and said, " 'Hey, you wanna go do something?' " When A.M. said he did, appellant immediately picked up A.M. Upon picking up A.M., appellant gave A.M. the gun because appellant did not want it found on him in case he got pulled over.

When appellant and A.M. arrived at James's house, appellant saw a car he did not recognize in James's driveway and changed his mind about shooting James. Appellant told A.M., " 'Fuck, I don't know whose car that is, Fool. I don't know about this.' " Appellant passed James's house, made a U-turn, turned his headlights off, and slowly began to approach James's house again, and as he did, A.M. said, " 'Well, let's at least scare 'em.' " A.M. then got out of the truck, and appellant thought "there's no sense in both of us getting out the car and fuckin' you know somebody had to drive, so I fuckin' I stayed in the fuckin' car." A.M. then shot through James's window. Appellant heard a couple of bangs. Appellant did not get out of the truck. A.M. then got back into the truck, and appellant "peeled off" and left the vicinity.

Appellant told the detectives he had work gloves on because he was going to shoot James. Appellant put them on when they started to get close to James's house. After the shooting, appellant took his clothes off and put them in a duffel bag. When appellant dropped A.M. off, he gave A.M. the bag and told A.M. to wash appellant's clothes. Appellant had another layer of clothes on underneath the clothes he took off so that he could avoid detection if he were to be caught. Appellant said the gloves he wore would still be in the bathroom of his home.

On August 10, a search warrant was executed at appellant's home where gloves were found that tested positive for gunshot residue. This suggested the gloves were "in the vicinity of the discharge of a firearm."

The pathologist who performed the autopsy testified that James had two gunshot wounds. One was on the back of the left shoulder above the armpit. The other was higher up on the left back passing upwards. Stippling, burned and unburned gunpowder, was present on James's body, which indicates the muzzle of the weapon was in close proximity to the skin's surface.

---

[7] A.M. did not testify at trial.

Appellant testified in his own defense. Appellant testified to substantially the same events as his most recent statement to the detectives. He testified that after A.M. said, "Let's at least scare him," appellant tried to talk A.M. out of it by saying, "Come on. Let's go. It's not worth it. Let's dip out." At that point, appellant said he had given up and did not want to hurt James. Appellant said that after A.M. got back in the car, A.M. never put the gun away, and the gun was pointed toward appellant. Appellant said that at the end of the night, he shook A.M.'s hand with appellant's gloves on. Appellant insisted he did not shoot James. Appellant said he was not truthful with law enforcement when he denied involvement because he was raised to avoid police contact. Appellant testified he did not like James and felt James was disrespectful toward him and others.

Apolinar, 2020 WL 65080, at *1–2 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" ///

1    clearly established Supreme Court precedent, the state decision is reviewed under the pre-
2    AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

3        "Under the 'reasonable application clause,' a federal habeas court may grant the writ if
4    the state court identifies the correct governing legal principle from [the] Court's decisions but
5    unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.
6    "[A] federal court may not issue the writ simply because the court concludes in its independent
7    judgment that the relevant state court decision applied clearly established federal law erroneously
8    or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,
9    538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists
10   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."
11   Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the
12   correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If
13   the Court determines that the state court decision is objectively unreasonable, and the error is not
14   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious
15   effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

16       The Court looks to the last reasoned state court decision as the basis for the state court
17   judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859
18   (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the
19   reasoning from a previous state court decision, this Court may consider both decisions to
20   ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.
21   2007) (en banc). "When a federal claim has been presented to a state court and the state court has
22   denied relief, it may be presumed that the state court adjudicated the claim on the merits in the
23   absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at
24   99. This presumption may be overcome by a showing "there is reason to think some other
25   explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v.
26   Nunnemaker, 501 U.S. 797, 803 (1991)).

27       Where the state courts reach a decision on the merits but there is no reasoned decision, a
28   federal habeas court independently reviews the record to determine whether habeas corpus relief

1   is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853

2   (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional

3   issue, but rather, the only method by which we can determine whether a silent state court

4   decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot

5   analyze just what the state court did when it issued a summary denial, the federal court must

6   review the state court record to determine whether there was any "reasonable basis for the state

7   court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or

8   theories . . . could have supported, the state court's decision; and then it must ask whether it is

9   possible fairminded jurists could disagree that those arguments or theories are inconsistent with

10  the holding in a prior decision of [the Supreme] Court." Id. at 102.

11                                          **IV.**

12                                     **DISCUSSION**

13        In the petition, Petitioner challenges the admission of his August 3, 2011 statements to

14  law enforcement, asserting that the state courts' adjudication of his claim resulted in a decision

15  that was contrary to, or involved an unreasonable application of, clearly established federal law

16  as determined by the Supreme Court and was based on an unreasonable determination of the

17  facts in light of the evidence presented in the state court. (ECF No. 1 at 5, 19.) In Ground One,

18  Petitioner claims that the "opinion of the Court of Appeals used a standard of reviewing the trial

19  court ruling that was contrary to, or involved an unreasonable application of, clearly established

20  federal law as determined by the Supreme Court of the United States." (ECF No. 1 at 5.)

21  Specifically, the California Court of Appeal "decided the admissibility of petitioner's statements

22  on the question of whether the police or petitioner re-initiated communication on the

23  investigation with a substantial evidence standard to review the trial court ruling that petitioner,

24  not the police, reinitiated the discussion about the investigation," which Petitioner contends is

25  "contrary to the US Supreme Court's holding that review of Miranda rulings are reviewed as a

26  mixed question of law and fact, in which the reviewing court accepts the trial court findings if

27  supported by substantial evidence, but exercises its independent judgment to decide whether

28  under those facts, the defendant's confession was obtained in violation of his constitutional

1  rights." (ECF No. 1 at 6.) Respondent argues that Petitioner is wrong "[i]nsofar as Petitioner

2  thinks a prior Supreme Court case clearly had held the Constitution imposes a different standard

3  of review" than the standard recited in the California Court of Appeal's opinion. (ECF No. 15 at

4  10.) Respondent further contends that a "supervision-based standard [of review], that Congress

5  may alter, is not a Constitution-demanded standard. Thus, there is nothing to discuss under

6  § 2254(a)." (ECF No. 15 at 10.)

7        The Court does not construe Petitioner's claim as challenging the standard of review per

8  se. Rather, based on the general substance of the arguments set forth in the petition and the

9  language of the California Court of Appeal decision at issue, the Court restates Petitioner's first

10  ground for relief as follows: After finding substantial evidence in the record supported the

11  determination that Petitioner initiated further discussions with the detectives, the California

12  Court of Appeal's failure to make a separate determination that Petitioner knowingly and

13  intelligently waived the right to counsel he had previously invoked was contrary to, or involved

14  an unreasonable application of, clearly established federal law as determined by the Supreme

15  Court. See United States v. Qazi, 975 F.3d 989, 992–93 (9th Cir. 2020) ("It is an entrenched

16  principle that pro se filings however inartfully pleaded are held to less stringent standards than

17  formal pleadings drafted by lawyers. We are specifically directed to construe pro se pleadings

18  liberally. This duty applies equally to pro se motions and with special force to filings from pro se

19  inmates." (internal quotation marks and citations omitted)); Allen v. Calderon, 408 F.3d 1150,

20  1153 (9th Cir. 2005) ("[T]he district court must construe pro se habeas filings liberally.").

21        Petitioner's challenge to the admission of his August 3, 2011 statements was raised on

22  direct appeal. The California Court of Appeal, Fifth Appellate District denied the claim in a

23  reasoned opinion. The claim was also raised in Petitioner's petition for review filed in the

24  California Supreme Court, which summarily denied the petition. As federal courts review the last

25  reasoned state court opinion, the Court will "look through" the California Supreme Court's

26  summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S.

27  Ct. at 1192.

28  ///

8

In denying relief, the California Court of Appeal stated:

***I. Admission of Appellant's August 3 Statement***

### A. Relevant Background

The trial court conducted an Evidence Code section 402 hearing regarding whether appellant's statements to the detectives would be admitted. The statements relative to this appeal took place on August 3.

On August 3, Grajeda explained to appellant that they had further investigated the death of James after speaking with him the first time and the following colloquy occurred:

> "[Grajeda:] ...And since [appellant's July 2 interview] based on the evidence that we got at, at the beginning of the investigation to now, since then we've developed a lot more information. And then with the information that we got and then with the statement that, that you gave and that [appellant's girlfriend] gave, we've had time now to compare everything. Alright and so now we're at a point where we need to talk to you again and I'd like to go over you know the whole thing with you. Uh, just so you can lay it out for us again and to see maybe if, if the discrepancies that we see are maybe just a misunderstanding or something, alright? But I wanna give you a chance so you can tell us from the beginning and I think eventually we'll talk to [appellant's girlfriend] again, 'cause some of the things are inconsistent with the evidence that, uh, that we have up to now, alright? But first we're gonna start with you. Before we do though, I'm gonna read you what's called the Miranda Admonition, have you heard that before?

> "[Appellant:] Ain't that shit they read every time you get locked up?

> "[Grajeda:] Well, you know ... *you're being questioned right now* and, uh, I don't know if they, if ... people read it every time you get locked up, but ...

> "[Appellant:] They're supposed to.

> "[Grajeda:] Well, not necessarily, but ... but I'm gonna read it to you now and when I read it I just want you to let me know whether you understand it or not, okay?

> "[Grajeda:] Have you heard it before?

> "[Appellant:] Yeah, I watch Cops.

> "[Grajeda:] (Laughing) so just on TV? [¶] ... Yeah? [¶] ... What about in, in real life, has anybody ever read you the Miranda Admonition?

1          "[Appellant:]    Yeah, every time I get fuck by cops they try to read me my Rights and shit.

2

3          "[Grajeda:]      Alright. And so do you understand them from what they read them to you before?

4          "[Appellant:] Well, I ...

5          "[Grajeda:]      It'll make it easier, I mean, I do it that way. I won't spend too much time with it.

6

7          "[Appellant:] Like fuck, I just ... it simply fuckin' asks right there to remain silent and shit ... and that I can have an attorney.

8          "[Grajeda:]      Okay, what else?

9          "[Appellant:] Fuck, I don't know. I mean ...

10        "[Grajeda:]      But basically those are the basics, right? So, you understand that part of it, right?

11

12        "[Appellant:] Yeah.

13        "[Grajeda:]      Alright. Alright, I'm gonna read it to you anyway ...

14        "[Appellant:] Yeah.

15        "[Grajeda:]      ... just briefly and just pay attention to the words and tell me if you understand it. Uh, YOU HAVE THE RIGHT TO REMAIN SILENT. Do you understand?

16

17        "[Appellant:] Yeah.

18        "[Grajeda:]      Okay. ANYTHING YOU SAY MAY BE USED AGAINST YOU IN COURT. Do you understand?

19        "[Appellant:] Yeah.

20        "[Grajeda:]      YOU HAVE THE RIGHT TO AN ATTORNEY PRIOR TO AND DURING ANY QUESTIONING. Do you understand?

21

22        "[Appellant:] Yeah.

23        "[Grajeda:]      AND IF YOU CAN NOT AFFORD AN ATTORNEY, ONE WILL BE APPOINTED FOR BEFORE QUESTIONING. Do you understand?

24

25        "[Appellant:] Yeah. Do they charge you for that-no, huh? It' just like a Public County shit, right?

26

27        "[Grajeda:]      Uh ...

         "[Appellant:] For the public?

28

1          "[Grajeda:]   Oh, you mean like ...

2          "[Toscano:]  It depends.

3          "[Grajeda:]   It depends.

4          "[Appellant:] Okay.

5          "[Grajeda:]   Uh, alright. So ... you, you said you've heard that before and I read it to you again and you understand all that, right? [¶] ... Alright. So, now let's just-what I'd like for you to do is just, uh ... about that night, the night when, uh ... that we were talking about last time when [James] was shot. Do you remember that ... do you remember when that was?" (Italics added.)

Appellant proceeded to answer the detectives' questions, and the interview lasted approximately two hours. Throughout the interview, appellant insisted he was out drinking at a friend's house all afternoon on the day of the murder. Appellant said that after he finished drinking around 9:00 p.m., he went straight home and went to sleep. The detectives told appellant about a statement they had taken from A.M. wherein A.M. said he was with appellant the night appellant shot James. Appellant continued to deny involvement.

At the end of the interview, appellant was placed under arrest for James's murder. As appellant was being handcuffed he said, "Wow. Can I get a lawyer, dude?" Grajeda responded, "Yeah, you can get whatever you want now."

The interview concluded at approximately 3:40 p.m. Grajeda testified at the Evidence Code section 402 hearing that appellant had been taken to a holding cell while the detectives attended to booking paperwork and other work related to the investigation. Grajeda said at approximately 8:50 p.m., Grajeda and Toscano approached appellant at his cell and advised him he would be transported to the jail. Toscano said "do you have anything to add or retract" or "[s]omething along those lines." Appellant then asked for a cigarette. Toscano responded that appellant could get a cigarette from whoever was transporting him. Appellant told the detectives that he wanted to talk to them. Appellant indicated it would not be a waste of the detectives' time and said he "was there, but ... didn't shoot." The detectives got appellant a cigarette from his property and took him outside to make a recorded statement. Grajeda told appellant he would be recording the conversation, and appellant said he understood.

The recording began:

          "[Grajeda:]   The date today is August 3, 2011 and the time is about 8:53 p.m. Detective Grajeda and Detective Toscano, here with [appellant] and we are here at Headquarters. Uh [appellant] has expressed that he'd like to speak with us again and, and we're here to speaking with him, is that the truth, [appellant]?

          "[Appellant:] Yeah.

> "[Grajeda:]   Okay. Alright and when we were just talking with you, you said [you] had some additional things to tell us and you even said, 'I was there, but I didn't do it, is that correct?'
>
> "[Appellant:]   That's correct.
>
> "[Grajeda:] Alright, go ahead, talk to us." (Unnecessary capitalization omitted.)

Appellant then went on to make inculpatory statements describing his involvement in the crime. This interview lasted about an hour.

At the Evidence Code section 402 hearing, the trial court held that appellant did not at any point invoke his right to have an attorney present during questioning. The trial court found the statement, "Wow. Can I get a lawyer dude?" not to be an unambiguous request for counsel. Rather, the trial court found the body language of appellant, as well as his tone of voice, rendered the question an inquiry rather than an invocation. The court also found the police did not reinitiate the subsequent interrogation with appellant. The trial court said when the detectives went to appellant's holding cell, "an interesting nuance occurred": "[Appellant] did not respond to the officer's question." The trial court goes on to say:

> "It's interesting that [appellant] doesn't respond to that with yes or no. He deflects that and says, I want a cigarette. And then, there is that additional dialogue, no, you can ask the transportation officer, and he can supply you a cigarette if he or she is desirous or agreeable to. And then, that's when the defendant then engages in the conversation about he would like to speak some more. Now, interestingly enough, in that [post holding cell interview], there is a spot ... which we listened to yesterday. And I wrote that down on my note pad. And it appears with the comment of [appellant] actually leads up to it by ... Toscano asking him, ... '[a]re you telling us now because you found out that he said something, and you just want to.' Answer, 'Dude, I'm telling you exact.' Toscano, 'Get him back.' [Appellant], 'No, it's not about that. I was—' Toscano, 'No.' [Appellant], 'No.' Toscano, 'I have to ask.' And then, [appellant] says 'Okay. I understand that, but it's just like, you know, what—I mean, fucking thinking about all that shit, you know.' It tells the Court that the time that [appellant] was sitting in these holding cells for the three and a half hour, just under four hour period, that [appellant] was thinking about the situation on his own. There is no evidence that somebody else was in there with him prodding him, expecting him to say anything else. He was—his wheels were turning. He was sitting in a holding cell wondering about the situation. He's thinking about it, and then he wanted to make a statement. That he was prepared to want to talk to the detectives or to whomever after having spent some time thinking it through in his head, that gives credibility to [Grajeda's] statement that [appellant] wanted to talk to the officers when they went to transfer him from the holding cell to the county jail for processing. [¶] ... The Court does not believe that the officers initiated contact with [appellant] on the attempt to have him transferred to the jail. Nor that the questions were being answered by [appellant] because they were being prodded out of him or coerced. There's no evidence of any type of coercion."

The trial court found there was no violation of appellant's *Miranda* rights and thus all appellant's statements to law enforcement were admissible.

12

## B. Analysis

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502.)

### 1. Asserted Invalid Waiver at the Beginning of the August 3 Statement

"*Miranda* makes clear that in order for [a] defendant's statements to be admissible against him, he must have knowingly and intelligently waived his rights to remain silent, and to the presence and assistance of counsel. [Citation.] [¶] ... We have recognized that a valid waiver of *Miranda* rights may be express or implied." (*People v. Cruz* (2008) 44 Cal.4th 636, 667.) "[U]ltimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*Id.* at p. 668.) The California Supreme Court has stated, "[a] suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights." (*Id.* at p. 667; accord, *People v. Medina* (1995) 11 Cal.4th 694, 752; *People v. Sully* (1991) 53 Cal.3d 1195, 1233.) This principle has been upheld by the United States Supreme Court, which explained: "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384, see *id.* at pp. 384–385 [finding implied waiver of *Miranda* rights].)

Appellant contends he did not knowingly and intelligently waive his right to have an attorney present at questioning because he did not understand the rights applied at the time he was being admonished. Appellant contends he had the mistaken belief the rights were triggered only upon arrest. Appellant states his confusion was evidenced by his asking, "Ain't that shit they read every time you get locked up," his making reference to the television show "Cops," and his saying, "Wow. Can I get a lawyer, dude?" after being placed under arrest. Appellant's claim fails.

There is no question from this record that appellant understood his rights to remain silent and to have an attorney present during questioning were triggered at the time the admonition was given and not by his subsequent arrest. Grajeda specifically informed appellant that appellant was being "questioned" in relation to James's death and then goes on to say appellant had the right to have an attorney present *during questioning* and that if he could not afford an attorney one would be appointed for him prior to *questioning*. Since Grajeda had just informed appellant he was being questioned, it is not reasonable for one to assume the rights did not apply at that time. Grajeda advised appellant, "you have the right to remain silent." (Capitalization omitted.) As Grajeda's admonition was in the present tense, as opposed to the future tense "will have" or "could have," the reasonable interpretation is that the right existed at the moment it was being given. Appellant clearly acknowledged that he understood all rights explained to him by saying "[y]eah" in response to each right admonished to appellant by Grajeda. Grajeda then *immediately* asked a question related to James's death, which appellant answered. Appellant's voluntary answering of questions, after clearly expressing he understood his rights, constituted a valid implied waiver.

The relevance of any statement appellant made prior to being admonished and acknowledging he understood his rights to our analysis is low. Even if appellant was confused about when his rights applied at the time he made the comments, his subsequent clear expression of understanding his rights indicates any confusion had been cleared up by the admonition. Appellant stating, "Can I get a lawyer" upon his arrest does not negate his clear expression of understanding of a sufficient admonishment. Appellant's implied waiver of his rights was valid.[8]

## 2. Asserted Invocation of Appellant's Right to Counsel

Appellant contends his statement, "Wow. Can I get a lawyer, dude?" was an invocation of his right to have an attorney present during questioning. For the purpose of our analysis, we assume arguendo appellant's request for counsel was unambiguous and thus an invocation of his right without resolving the issue on its merits. We hold, in any event, that because substantial evidence supports the trial court's finding the detectives did not reinitiate subsequent interrogation at the holding cell, appellant's statements were admissible.

In *Edwards*, the defendant was informed of his rights as required by *Miranda* and said he understood his rights and was willing to submit to questioning. (*Edwards*, *supra*, 451 U.S. at p. 478.) The defendant denied involvement in the crime, gave a taped statement presenting an alibi defense, and sought to " 'make a deal.' " (*Id.* at p. 479.) When the interrogating officer told the defendant the officer was not authorized to negotiate a deal and provided the defendant with the telephone number of a county attorney, the defendant said, " 'I want an attorney before making a deal.' " (*Ibid.*) Questioning then ceased, and the defendant was taken to county jail. (*Ibid.*) The next morning at 9:15 a.m., two different detectives than the interrogating officer went to the jail and asked to see the defendant. (*Ibid.*) When the guard told the defendant the detectives wished to speak with him, the defendant told him he did not want to talk with anyone. (*Ibid.*) The guard then told the defendant " 'he had' " to talk and then took him to meet with the detectives. (*Ibid.*) The defendant then willingly made incriminating statements to the detectives. (*Ibid.*)

The *Edwards* court held "that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." (*Edwards*, *supra*, 451 U.S. at p. 484, fn. omitted.) The court went on: "[A]n accused, such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

---

[8] Before oral argument, respondent submitted *People v. Molano* (2019) 7 Cal.5th 620 (*Molano*) to this court as authority relevant to appellant's *Miranda* issue. In *Molano*, law enforcement officers conducted a "ruse" wherein they presented themselves to the defendant as "290 investigators." (*Molano* at pp. 634 [referring to § 290 et seq., the Sex Offender Registration Act].) The officers indicated they were going to ask appellant about his past crimes before being released into the community and that they needed to read his *Miranda* rights to him first, but the officers' true goal was to talk to the defendant about a homicide case. (*Molano* at p. 634.) The defendant appealed, contending his *Miranda* waiver was not knowing, intelligent, or voluntary. (*Molano* at p. 648.) The appellate court held that the officers' "ruse" did not invalidate the defendant's waiver of his *Miranda* rights. (*Molano* at p. 633.) At oral argument, appellant argued *Molano* was inapposite because it was exclusively a "ruse case." We do not find *Molano* is necessarily restricted to "ruse cases," but stands for the long-standing proposition that withholding information from a defendant does not invalidate a *Miranda* waiver. (*Molano* at pp. 649-654.) In any event, our conclusion that appellant's waiver was knowing, intelligent, and voluntary is independent of the *Molano* case.

communication, exchanges, or conversations with the police." (*Id.* at pp. 484–485.) Accordingly, the *Edwards* court held the statements were taken in violation of the defendant's *Miranda* rights. (*Edwards*, at p. 487.) The *Edwards* rule was "in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was." (*Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1044.)

The question whether it was the defendant or the police who reinitiated communications of the requisite nature, after the defendant's invocation of the right to counsel, is predominantly factual and therefore reviewed under the substantial evidence standard. (*People v. Gamache* (2010) 48 Cal.4th 347, 385.)

Here, the trial court's alternative determination that appellant, not the detectives, reinitiated contact is supported by substantial evidence. As an initial matter, we acknowledge the encounter at the holding cell was not recorded, but note the trial court emphasized it found Grajeda's testimony credible. We defer to the trial court's credibility determination regarding what happened at the holding cell. As the trial court points out, appellant ignored Toscano's question about whether he had anything to add or retract, and asked for a cigarette. Toscano's response in kind showed he had in essence abandoned the question, and it was then that appellant told the detectives he wanted to talk to them. This is distinguishable from the facts in *Edwards* and is a far cry from the type of badgering from which the *Edwards* rule is meant to protect. Grajeda testified that he did not remember the exact words appellant used, but Grajeda "kn[ew appellant] wanted to talk to us. [Appellant] told us he wanted to talk to us." Grajeda testified appellant indicated "it wouldn't be a waste of our time."

We find appellant's comment that he would not "waste [the detectives'] time" telling. With this comment, appellant appears to be attempting to persuade the detectives to talk with him rather than the other way around. It further supports the inference that Toscano's question was no longer pending, and the subject of conversation had changed.

When the audio recording began, appellant confirmed that it was he who wanted to talk to the detectives and began his statement in narrative form. Further, as the trial court pointed out, when Toscano asked appellant if he was talking to them because he found out A.M. said he was involved, appellant responded, "No, it's not about that, I was ... [¶] ... [¶] ... it's just like ... you know what I mean, fuckin' thinking about all that shit you know? [¶] ... [¶] ... And fuckin' doing time for some shit I didn't do." We accept the trial court's inference that appellant was contemplating making a statement while sitting in the holding cell.

Appellant argues that Toscano's comment about whether appellant had anything to add or retract to his statement was a reinitiation of the interrogation, and points out that the evidence is uncontroverted that the encounter at the holding cell only lasted three minutes. Our analysis is not based on the passage of time; rather, the course of events which transpired within those three minutes, drawing every inference in favor of the trial court's ruling.

The trial court's alternative finding that appellant reinitiated the questioning is supported by substantial evidence in the record, and accordingly, appellant's subsequent statements were admissible.

Apolinar, 2020 WL 65080, at *3–9 (footnote in original).

### A. **Miranda** and Its Progeny

In Miranda v. Arizona, 384 U.S. 436 (1966), the United State Supreme Court held that before a suspect can be subjected to custodial interrogation, he must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 479. "[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300 (1980).

"Building on Miranda, Edwards v. Arizona set out the analysis that courts must follow when a defendant has invoked his right to counsel." Martinez v. Cate, 903 F.3d 982, 992 (9th Cir. 2018) (citing Edwards v. Arizona, 451 U.S. 477, 482–86 (1981)).

> First, Edwards explained that "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." Id. at 482, 101 S.Ct. 1880. Edwards then held that "a valid waiver of that right cannot be established by showing only that [a suspect] responded to further police-initiated custodial interrogation." Id. at 484, 101 S.Ct. 1880. Finally, Edwards established the rule that once an accused invokes the right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484–85, 101 S.Ct. 1880.

Martinez, 903 F.3d at 992. "Edwards thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990) (citing Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983) (plurality opinion)). The Supreme Court has described "Edwards [as] establish[ing] a bright-line rule," Solem v. Stumes, 465 U.S. 638, 646 (1984), "that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present," Minnick v. Mississippi, 498 U.S. 146, 153 (1990).

However, the "prophylactic rule set out in Edwards is limited by two principles." Martinez, 903 F.3d at 992.

> First, the suspect can counteract his own invocation of the right to counsel by "initiat[ing] further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 485. A suspect "evinc[ing] a willingness and a desire for a

generalized discussion about the investigation[,]" including asking "what is going to happen to me now?" is sufficient to initiate further discussions with the police. See Oregon v. Bradshaw, 462 U.S. 1039, 1045–46, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (plurality opinion) (Rehnquist, J.). But, initiating further discussions is not sufficient to admit a defendant's responses. "[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." Smith v. Illinois, 469 U.S. 91, 95, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984) (per curiam) (citing Edwards, 451 U.S. at 485-86, n.9).

Second, the rule in Edwards does not apply to all interactions with the police — it applies only to custodial interrogation. Edwards, 451 U.S. at 486. In other words, not all communications with the police after a suspect has invoked the right to counsel rise to the level of interrogation. "'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). "[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Id. at 300–01.

Martinez, 903 F.3d at 992–93.

## B. AEDPA Review

In Oregon v. Bradshaw, 462 U.S. 1039 (1983), the Supreme Court found that "the Oregon Court of Appeals was wrong in thinking that an 'initiation' of a conversation or discussion by an accused not only satisfied the Edwards rule, but *ex proprio vigore* sufficed to show a waiver of the previously asserted right to counsel. The inquiries are separate, and clarity of application is not gained by melding them together." 462 U.S. at 1045 (Rehnquist, J., plurality opinion); see id. at 1048–49 (Powell, J., concurring) (recognizing that the eight justices in the plurality and dissent agree that *Edwards* requires a two-step analysis of (1) initiation, and (2) knowing and intelligent waiver). Subsequently, in Smith v. Illinois, 469 U.S. 91 (1984) (per curiam), the Supreme Court reiterated that "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." 469 U.S. at 95 (citing Edwards, 451 U.S. at 485, 486, n.9). The Ninth Circuit has found that Edwards established that "a finding that a post-invocation admission is *voluntary* is not sufficient to demonstrate waiver. Rather, for an uncounseled post-invocation statement to be admissible, the court must also find that the suspect first waived his right to counsel knowingly,

1  intelligently, and voluntarily." Rodriguez v. McDonald, 872 F.3d 908, 921 (9th Cir. 2017) (citing

2  Edwards, 451 U.S. at 482–84).

3       Here, the California Court of Appeal specifically noted that "[i]n reviewing Miranda

4  issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as

5  its evaluations of credibility if substantially supported, but independently determine from

6  undisputed facts and facts found by the trial court whether the challenged statement was legally

7  obtained." Apolinar, 2020 WL 65080, at *6 (internal quotation marks omitted) (quoting People

8  v. Smith, 40 Cal. 4th 483, 502 (2007)). However, in concluding that Petitioner's statements to

9  the detectives after they got Petitioner a cigarette from his property and took him outside to make

10 a recorded statement were admissible, the California Court of Appeal merely stated: "The trial

11 court's alternative finding that appellant reinitiated the questioning is supported by substantial

12 evidence in the record, and *accordingly*, appellant's subsequent statements were admissible."

13 Apolinar, 2020 WL 65080, at *9 (emphasis added). The California Court of Appeal did not make

14 an explicit or separate determination that Petitioner knowingly and intelligently waived the right

15 to counsel he had previously invoked. Based on the California Court of Appeal's use of the word

16 "accordingly," it appears that the state court committed the same error criticized by the Supreme

17 Court in Bradshaw—"thinking that an 'initiation' of a conversation or discussion by an accused

18 not only satisfied the Edwards rule, but *ex proprio vigore* sufficed to show a waiver of the

19 previously asserted right to counsel." 462 U.S. at 1045. Based on the foregoing, the Court finds

20 that the state court's failure to make a separate determination that Petitioner knowingly and

21 intelligently waived the right to counsel he had previously invoked was contrary to, or involved

22 an unreasonable application of, clearly established federal law.[9]

23       **C.  De Novo Review**

24       The Court now proceeds to review Petitioner's claim de novo. See Panetti v. Quarterman,

25 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an

26 antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is

27

28 _____

[9] In light of this conclusion, the Court will not address Ground Two of the petition asserting that the state court's determination the detectives did not reinitiate interrogation was unreasonable in light of the evidence presented in the state court proceeding.

1    satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise

2    requires.”); Frantz v. Hazey, 533 F.3d 724, 735–36 (9th Cir. 2008) (en banc).

3            1.    Invocation of Right to Counsel

4            “Only an unambiguous invocation of the right to counsel triggers protection under

5    Edwards.” Petrocelli v. Baker, 869 F.3d 710, 723 (9th Cir. 2017), as amended (Aug. 23, 2017).

6    “An invocation is unambiguous if the accused ‘articulate[s] his desire to have counsel present

7    sufficiently clearly that a reasonable police officer in the circumstances would understand the

8    statement to be a request for an attorney.’” Id. (alteration in original) (quoting Davis v. United

9    States, 512 U.S. 452, 459 (1994)). “‘[I]f a suspect makes a reference to an attorney that is

10   ambiguous or equivocal in that a reasonable officer in light of the circumstances would have

11   understood only that the suspect *might* be invoking the right to counsel,’ cessation of questioning

12   is not required.” Mays v. Clark, 807 F.3d 968, 977 (9th Cir. 2015) (quoting Davis, 512 U.S. at

13   459). “Whether a statement is an unambiguous request for counsel ‘is an objective inquiry.’”

14   Paulino v. Castro, 371 F.3d 1083, 1087 (9th Cir. 2004) (quoting Davis, 512 U.S. at 459).

15   “[R]equests for counsel are to be ‘understood *as ordinary people* would understand them.’”

16   Sessoms v. Grounds, 776 F.3d 615, 628 (9th Cir. 2015) (en banc) (quoting Connecticut v.

17   Barrett, 479 U.S. 523, 529 (1987)).

18           The Ninth Circuit has found that the “inquiry—‘Can I get an attorney right now, man?’—

19   clearly expressed [a] desire for an attorney in dealing with police interrogation.” Paulino, 371

20   F.3d at 1088 (discussing Alvarez v. Gomez, 185 F.3d 995 (9th Cir. 1999)). Similarly, the Ninth

21   Circuit has held that the “statement—‘Could I have an attorney? Because that’s not me’—was an

22   unequivocal invocation of [the] right to counsel under clearly established law.” Tobias v.

23   Arteaga, 996 F.3d 571, 580 (9th Cir. 2021). Accordingly, the Court finds that Petitioner’s

24   statement—“Wow. Can I get a lawyer, dude?”—was an unequivocal invocation of his right to

25   counsel.[10]

26   ///

27   ───────────────

28   [10] The Court has reviewed the video recording of the first August 3, 2011 interview, (LD 17), and does not agree
     with the trial court’s determination that “the body language of [Petitioner], as well as his tone of voice, rendered the
     question an inquiry rather than an invocation,” Apolinar, 2020 WL 65080, at *5.

2. <u>Prejudice</u>

Assuming that an <u>Edwards</u> violation occurred and the detectives reinitiated communication, the Court finds that Petitioner is not entitled to habeas relief because he has not established that the error resulted in prejudice. "[H]abeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.'" <u>Ayala</u>, 576 U.S. at 267 (some internal quotation marks omitted) (quoting <u>Brecht</u>, 507 U.S. at 637). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Ayala</u>, 576 U.S. at 267–68 (some internal quotation marks omitted) (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995)). "There must be more than a 'reasonable possibility' that the error was harmful." <u>Ayala</u>, 576 U.S. at 268 (quoting <u>Brecht</u>, 507 U.S. at 637).

Excluding Petitioner's challenged statements to law enforcement and assuming Petitioner would not have testified at trial if his prior statements had not been admitted,[11] the evidence at trial credibly established the following: The victim had terminated Petitioner's employment. (3 RT 361–62, 396–97.) On the evening of June 30, 2011, Petitioner encountered the victim's brother, verbally confronted him, hurled invectives about the victim, and stated, "Well, I'll tell it to [the victim's] face. . . . I'll go to his house and tell him." (3 RT 331–34.) Later that night, the victim was shot while taking a shower in his home and died. (4 RT 771–78; 6 RT 1130.) A witness's description of a pewter or champagne colored Chevy pick-up truck with an extended cab leaving the scene after the shooting was consistent with Petitioner's truck. (3 RT 422, 443; 4 RT 719–20, 725, 741–42, 751, 756.) Tire prints at the scene were consistent with Petitioner's vehicle. (4 RT 678–86.) Police found a pair of gloves with gunshot residue in Petitioner's residence. (5 RT 910, 958–60.) This suggested the gloves were "in the vicinity of the discharge of a firearm." (5 RT 959, 960.) Given the weight of the other evidence introduced at trial, the Court does not have "grave doubt" that the error "had substantial and injurious effect or

---

[11] "[W]hen a criminal defendant's trial testimony is induced by the erroneous admission of his out-of-court confession into evidence as part of the government's case-in-chief, that trial testimony cannot . . . be used to support the initial conviction on harmless error review, because to do so would perpetuate the underlying constitutional error." <u>Lujan v. Garcia</u>, 734 F.3d 917, 930 (9th Cir. 2013) (citing <u>Harrison v. United States</u>, 392 U.S. 219 (1968)).

1   influence in determining the jury's verdict" that Petitioner was guilty of first-degree murder.

2   O'Neal, 513 U.S. at 436. In fact, as noted by Respondent, without Petitioner's challenged

3   statements, the jury "would have had no evidence to even question that he personally was the

4   shooter and thus they would have returned a true finding on the firearm enhancement." (ECF No.

5   15 at 12.)

6    Similarly, if Petitioner elected to testify and his testimony remained unchanged, the Court

7   does not have grave doubt that the error had substantial and injurious effect on the jury's verdict

8   because Petitioner's trial testimony largely mirrored and did not contradict his challenged

9   statements to law enforcement. Moreover, if Petitioner elected to testify at trial and his testimony

10  was inconsistent with his prior statements to law enforcement, the Court does not have grave

11  doubt that the error had substantial and injurious effect on the jury's verdict because the

12  prosecution would have been able to introduce the challenged statements to impeach Petitioner's

13  testimony. See Oregon v. Elstad, 470 U.S. 298, 307 (1985) ("Despite the fact that patently

14  *voluntary* statements taken in violation of *Miranda* must be excluded from the prosecution's

15  case, the presumption of coercion does not bar their use for impeachment purposes on cross-

16  examination."); United States v. Gomez, 725 F.3d 1121, 1126 (9th Cir. 2013) ("But a

17  defendant's voluntary statements—even if obtained in violation of *Miranda*—are admissible as

18  impeachment evidence."); People v. Sanchez, 7 Cal. 5th 14, 58 (2019) ("A statement that is

19  otherwise voluntary, but taken in violation of the *Miranda* rules, may be admitted to impeach a

20  defendant who testifies.").[12]

21   The Court recognizes that a "confession is like no other evidence," Arizona v.

22  Fulminante, 499 U.S. 279, 296 (1991), and the "prejudice from [a] confession cannot be soft

23  pedaled," Anderson v. Terhune, 516 F.3d 781, 792 (9th Cir. 2008) (en banc). "Exercising

24  _____

25  [12] The Due Process Clause of the Fourteenth Amendment requires confessions to be voluntary in order to be
    admitted into evidence. Dickerson v. United States, 530 U.S. 428, 433 (2000). "To determine whether a confession

26  is involuntary, we must ask 'whether a defendant's will was overborne by the circumstances surrounding the giving
    of a confession,' considering 'the totality of all the surrounding circumstances—both the characteristics of the

27  accused and the details of the interrogation.'" Balbuena v. Sullivan, 980 F.3d 619, 629 (9th Cir. 2020) (quoting
    Dickerson, 530 U.S. at 434), cert. denied sub nom. Balbuena v. Cates, 141 S. Ct. 2755 (2021). Petitioner has not

28  asserted that his confession was involuntary, and there is no indication that Petitioner's confession was involuntary
    based on the record before this Court.

extreme caution, as we must, before determining that the admission of a confession at trial was harmless," Jones v. Harrington, 829 F.3d 1128, 1142 (9th Cir. 2016) (internal quotation marks, brackets, and citation omitted), the Court concludes that the admission of Petitioner's statements to law enforcement did not have a "substantial and injurious effect or influence in determining the jury's verdict," Brecht, 507 U.S. at 637. Accordingly, Petitioner is not entitled to habeas relief, and the petition should be denied.

## V.

## RECOMMENDATION & ORDER

Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

Further, the Clerk of Court is DIRECTED to update Petitioner's address to:

> Chuckawalla Valley State Prison
> P.O. Box 2349
> Blythe, CA 92226[13]

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time

///

---

[13] See State of California Inmate Locator, http://inmatelocator.cdcr.ca.gov/search.aspx (results for "Rafael Apolinar" or CDCR Number BA2177) (last visited July 27, 2022); see also United States v. Basher, 629 F.3d 1161, 1165 & n.2 (9th Cir. 2011) (taking judicial notice of publicly available information from the Federal Bureau of Prisons Inmate Locator). The Court's two most recent orders were returned as undeliverable, and according to the California Department of Corrections and Rehabilitation's Inmate Locator, Petitioner has moved to a different facility. It is Petitioner's responsibility to keep the Court apprised of his current address at all times. Local Rule 183(b). Absent notice of a party's change of address, service of documents at the prior address of the party is fully effective. Local Rule 182(f). However, in the interest of justice, the Court will make an exception and update Petitioner's address so that Petitioner may receive the findings and recommendation and file any objections thereto.

may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 7, 2022**

UNITED STATES MAGISTRATE JUDGE